## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| INSIGHT SECURITIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | |
| | ) | |
| STATE STREET BANK AND TRUST CO., | ) | |
| | ) | |
| Defendant. | | |

## COMPLAINT AT LAW

Plaintiff Insight Securities, Inc, a Delaware corporation ("Insight"), by and through its undersigned attorneys, and, for its complaint against State Street Bank and Trust Company ("State Street"), saying as follows:

## NATURE OF THE CASE

1.     This is a claim for damages incurred by Insight as a result of State Street's participation in the conversion of securities owned by Insight's customers as a consequence of State Street knowingly processing fraudulent transfer instructions that occurred as a result of a conspiracy with Deutsche Bank Trust Company of America and Deutsche Bank Securities, Inc. to circumvent anti-money laundering statutes, regulations, and rules.

## JURISDICTION AND VENUE

2.     Insight is, and at all times relevant hereto was, a broker/dealer registered with the Financial Industry Regulatory Authority ("FINRA"), with its principle place of business in Highland Park, Illinois.

3.     State Street is a trust company chartered in Massachusetts with its principal place of business in Boston, Massachusetts and is the largest custodian bank in the world.

4.     The amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1332.

6.     Venue is properly before the United States District Court for the Northern District of Illinois, Eastern Division because the transfer instructions at issue herein emanated from Highland Park, Illinois and the damages as a result of the unlawful conduct herein alleged were incurred by Insight in Highland Park, Illinois.

**THE RELATIONSHIP BETWEEN STATE STREET
AND DEUTSCHE BANK**

7.     Deutsche Bank Trust Company Americas, ("DBTCA"), is a New York state-chartered bank that is a member of the Federal Reserve System and is a subsidiary of DB USA Corporation, New York ("DB USA"), a bank holding company.

8.     DBTCA maintains accounts for customers located throughout the Western Hemisphere.

9.     Deutsche Bank Securities, Inc. ("DBSI") is a Delaware corporation with its principle place of business in New York City, New York and, at all times relevant hereto, was a securities broker/dealer registered with FINRA and is a direct affiliate of, and partner with, DBTCA.

10.    DBSI registrants service and supervise the customer accounts maintained by DBTCA to conform with applicable statutes, regulations and rules.

11.    At all times relevant hereto, DBTCA, DBSI, and Deutsche Bank AG, New York Branch, were members of an internal Deutsche Bank entity know as Private Wealth Management a/k/a Deutsche Bank Private Wealth Management ("PWM").  As part of its role in that internal partnership among the various Deutsche Bank entities, DBTCA utilized State Street to: (a) maintain the custody accounts for its customers; and (b) to act as DBTCA's agent for receiving DTC transfers for deposit in DBTCA's State Street omnibus account bearing the account number BJ60 (*see* Exhibit "A" hereto at p.2") from which the securities would then be deposited into the State Street custody account of DBTCA's customers.

12.    At all times relevant hereto, PWM was controlled by DBSI employees and registrants.

13.    The Depository Trust Company ("DTC"), a subsidiary of The Depository Trust & Clearing Corporation (DTCC), is chartered as a limited-purpose trust company under New York State banking law, a member of the Federal Reserve System, and is a clearing agency registered with the Securities Exchange Commission ("S.E.C."), which is utilized by non-FINRA member financial institutions to transfer domestically-traded securities to or from non-FINRA members.

14.    At all times relevant hereto, State Street was a participant in the DTC transfer system and maintained DTC participant number 0987. *See* Exhibit "A" hereto.

15.    As a DTC participant, State Street is obligated to process transfers submitted to the DTC transfer system in accordance with the rules promulgated by DTC.

16.    At all times relevant hereto, DTC transfer rules required DTC participants such as State Street to reject an attempted DTC securities transfer when the customer and account number specified in the DTC transfer instructions do not match the customer name or account numbers of a custody account maintained by DBTCA for DBTCA.

17.    At all times relevant hereto, DBTCA (and hence PWM) utilized the services State Street as its agent for DTC transfers.

18.    At all times relevant hereto, State Street, in turn, utilized the services of Fidelity National Information Services, Inc. a/k/a FIS Global ("FIS"), a financial services technology solutions firm to interface with DBTCA in  processing DTC transfers made for the benefit of and credit to DBTCA's customer custody accounts maintained at State Street.

19.    At all times relevant hereto, DBTCA customers or their authorized agents would provide the DBSI registrant assigned to their DBTCA custody account of information regarding the securities being transferred into his/her customer account, as described *infra*.

20.    The DBSI registrant handling the customer's DBTCA account would, in turn, provide that information to FIS.  However, and importantly, this information

could not direct the transfer of assets to a DBTCA account in contradiction to the transfer instructions received by State Street through the DTC system.

21.    When State Street received a DTC transfer, State Street would inform FIS of its receipt of the securities transferred via DTC. FIS, based on the information submitted by DBTCA regarding the transferred securities, would then instruct State Street into which DBTCA custody account the securities were to be deposited.

22.    Neither State Street nor FIS transmitted the actual information contained in the DTC transfer instruction to DBTCA.

23.    Therefore, the only AML record maintained by DBTCA for the transfer was the information received from DBTCA's customer or the customer's authorized agent.

## DTC TRANSFERS

24.    The DTC transfer system is a "push" transfer system in that the transferring financial institution "pushes" the securities to the receiving DTC participant. The receiving DTC participant in turn accepts the transfer only if the transfer instructions match the name and account number in the records of the receiving institution on whose behalf the participant is acting. If there is no such match, the DTC transfer is, pursuant to DTC participant rules, rejected and the securities returned to the transferring institution. This procedure is core to the efficient operation of the securities markets and the protection of securities investors.

25.    The information required by DTC to be provided by the institution initiating a DTC securities transfer includes:

a. Committee on Uniform Securities Identification Procedures ("CUSIP") of the security; the registered name of the security; the quantity of the security being transferred; and the trade date (date the transfer is initiated);

b. the DTC participant code of the sender;

c. The name of the delivering institution

d. The name of the delivering party

e. The account number of the delivering party at the delivering institution

f. the DTC participant code of the receiving institution;

g. the account number of the DTC receiving institution to which the transfer is being directed.; and,

h. the account name and account number into which the securities are to be deposited.

26.     If *any* of the forgoing information in the DTC transfer instruction is erroneous or does not match the records of the receiving institution, the transfer must be rejected, and the securities returned to the transferring institution.

27.     DTC transfers fall into two categories: (a) securities being sent by an account holder to another account owned by the account holder (e.g., a "same name transfer"); or (b) securities being sent by some other person or entity for deposit in the customer's account (a "third-party transfer").

28.     At all relevant times hereto, same name transfers required minimal verification since such transfers do not lend themselves to money laundering or fraud. However, third-party transfers automatically require greater scrutiny, including verbal confirmation of the sending instructions with the customer initiating the transfer in order to comply with AML statutes, rules and regulations.

29.      Moreover, third-party transfers obligate the receiving institution to initiate inquiries with the intended recipient regarding, *inter alia*, the relationship of

the sender of the securities to the recipient of the transfer and the reason the sender is transferring assets to the recipient.

30.     Both the sending and receiving institutions must record the respective information for such third-party transfers so that there is an audit trail for regulatory agencies investigating money laundering, fraud, and bribery infractions.

## STATE STREET'S PARTICIPATION IN THE SCHEME
## TO FACILITATE MONEY LAUNDERING

31.     Beginning at a time prior to January 1, 2017, DBTCA and DBSI as members of PWM conspired with State Street to devise a system for receiving securities transferred to DBTCA that circumvented the requirements of the applicable laws, rules, and regulations relating to anti-money laundering ("AML") compliance, including, *inter alia*, the Bank Secrecy Act ("BSA") (31 U.S.C. § 5311 *et seq*.); the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Chapter X); and the AML regulations issued by the appropriate federal supervisors for DB USA, DBTCA, and the DB USA Branch, including, but not limited to: H and Y of the Board of Governors (12 C.F.R. § 208.62 *et seq.* and § 225.4(f)).

32.     Through this scheme State Street participated in the conversion of several millions of dollars' worth of securities belonging to three Insight customers pursuant to a conspiracy with DBTCA and DBSI to disguise third-party transfers as same name transfers in circumvention of AML statutes, regulations and rules.

33.     As stated above, the DTC system "pushes" the securities to be transferred to the receiving DTC participating institution which either accepts the

securities, does nothing (which results in an automatic rejection of the transfer) or affirmatively rejects the transfer.

34.     In an AML compliant system, State Street would have forwarded the DTC transfer instructions that it receives to FIS which, in turn, would endeavor to match the instructions received by DBTCA as to the account name and number into which the securities were to be transferred. FIS would then either inform State Street to accept the transfers matching the name and account number specified by DBTCA or to reject any non-matching instructions.

35.     State Street never directly, or through FIS, provided DBTCA with the actual DTC instructions received. This enabled PWM to record all DTC transfers received and deposited in its customer accounts as same name transfer regardless of the content of the actual DTC transfer instructions.

36.     State Street and DBSI along with DBTCA, through PWM, conspired to circumvent AML statutes, regulations and rules by adopting the following procedure:

A. When State Street received a DTC securities transfer for the benefit of a purported DBTCA customer, State Street which knew the names and custody account numbers of DBTCA's customers did not compare whether the name and account number specified in the DTC transfer instructions matched with the identifying information for the DBTCA customer accounts for which State Street was maintaining a custody account;

B. Instead, State Street would only forward to FIS the information pertaining to the securities received;

C. FIS would then compare the received securities to the information received from DBTCA regarding the expected transfer and deposit the securities in the account specified by DBTCA, which may or may not conform to the account specified in the DTC instructions.

This procedure enabled the holder of the DBTCA account to characterize a third-party transfer into his or her account as a same name transfer on DBTCA's book and records, thereby circumventing the more stringent AML requirements for third party transfers and providing a direct avenue for money laundering and fraud.

37. For example, if X was desirous of bribing public official Y with $1 million in notes, bonds, or stocks:

    a. Public official Y merely needed to open a DBTCA custody account. Once the account was active, the public official only needed to inform DBTCA that he or she was transferring the specified bonds, notes or stocks into public official Y's DBTCA account;

    b. DBTCA would then notify FIS that $1 million in the specified securities were being transferred for the benefit of public official Y's DBTCA custody account;

    c. X would then submit a DTC instruction to X's financial institution for a same name transfer to X's *non-existent* DBTCA custody account;

    d. When the DTC transfer from X was received by State Street, rather than rejecting the transfer because X did not maintain a DBTCA account, State Street would inform FIS that the $1 million in the securities had been received;

    e. FIS would then compare the information received from State Street regarding the securities (*e.g.* name, CUSIP, and quantity) to the information received from DBTCA that those matching securities were to be deposited in public official Y's account.

X's financial institution would reflect that X had made a same name transfer. Similarly, DBTCA's records would reflect that corrupt official Y had made a same name transfer to DBTCA. Thus, an illegal transfer would be reflected on the records of both the sending and receiving institutions as innocent same name transfers.

Similar transfers could be initiated by drug dealers, terrorists or human traffickers to launder assets.

38.     State Street further knew that, by withholding from DBTCA the information regarding the identity of individual or entity specified on the transfer instructions  as well as the DBTCA custody account number into which the transferred securities were to be deposited, could facilitate the type of fraud worked upon Insight and the three Insight customers whose securities were subject to forged transfer instructions alleged below.

39.     State Street's practice of withholding information regarding DTC transfers that, if disclosed to DBTCA or PWM would result in red flags that would require escalation, was memorialized in a January 26, 2018 email from one PWM compliance person assigned to DBTCA to other PWM personnel assigned to DBTCA and/or DBSI in which he stated:

> When we spoke to State Street last year about some account issues, *it is their practice not to tell us everything because we are supposed to be savvy enough to understand that an alert or concern should result in further action or escalation by DB.*

Exhibit "B" hereto at p. 3 (emphasis supplied).

40.     Subsequently, a PWM DBSI registrant inquired of FIS how securities listed in a DTC transfer instruction that identified a non-existent DBTCA customer and account was deposited into an unidentified account of a DBTCA customer whose DBTCA account was the subject of a $12.3 million overdraft. The FIS employee's response confirmed that State street was withholding from FIS the customer name and account number specified on DTC transfer instructions and instead only

transmitted to FIS information regarding the securities specified in a DTC transfer instruction. *See* Exhibit "C", p.2. The FIS employee stated:

| | |
|---|---|
| **From:** | Kerthi, Erjona [Erjona.Kerthi@fisglobal.com] |
| **Sent:** | 6/5/2018 5:40:26 PM |
| **To:** | Gloria P Molina [gloria.p.molina@db.com] |
| **CC:** | Janet Morales [janet.morales@db.com]; Nicholas Haigh [nicholas.haigh@db.com] |
| **Subject:** | RE: Case number: 1924098 - Rado [I] |

Hello Gloria,

It was my understanding that signed instructions were provided by DB to us on the cases that were created back in March but I can double check again. Also, please note that when we receive the free receipts on custody do not have access to the screenshot details I provided and Asset team matches what DB instruct us. I am not too familiar with what everything on the screenshots represents but thought that the below were the originator information.

**Text Comments**
Line 1: QGU███████2 731H85, AP███3 , SD: 031618, , SEQ# 02479
Line 2: C/O INSIGHT SECURITIES INC F/A/O CLODI HOLDINGS LTD MARCY BUILDING 2NDS FLOOR A/
Line 3: C AP███3 FBO CLODI HOLDINGS LTD MARCY BUILDING 2NDS FLOOR PURCELL ESTATE TORTOLA
Line 4: , BRITISH VIRGIN ISLANDS

Best wishes,

Erjona Kerthi

FIS Global
Wealth & Retirement Administration
2 Heritage drive, 2ⁿᵈ Floor
Quincy, MA 02171
Phone 617-729-4527
Email erjona.kerthi@fisglobal.com
Team Hotline 617-729-4602
Team Email Sg_dbclientservice@fisglobal.com
FIS | Empowering the Financial World 🔵🔵🔵

## THE FRAUDLENT TRANSFERS THAT TRANSFERRED SECURITIES OWNED BY THREE OF INSIGHT'S CUSTOMERS TO AN UNRELATED DBTCA ACCOUNT

41. Insight had informed a third-party financial advisor for several of its customers, Total Advisors, LLC ("Total"), that beginning January 1, 2018, all accounts carried by Insight that employed Total as the account's investment advisor, needed to be transferred elsewhere.

42.     Thereafter, Total and its associated advisory firm, Pro Advisors, LLC
began submitting dozens of same name instructions each week for the affected
customer accounts. All affected accounts, including the three customer accounts at
issue here, had been placed on a liquidation-only status. Thus, Insight expected these
three customer accounts to submit similar same name transfer instructions.

43.     In March 2018, as expected, Insight received instructions purportedly
sent by these three customers to submit same-name instructions to transfer the
securities in their Insight accounts to same name accounts maintained at another
broker/dealer or eligible financial institution.

44.     On March 8, 2018, Insight received instructions forged by Fernando
Haberer ("Haberer") who operated Total to transfer 810,000 shares of MS 2.5% 2019,
CUSIP 61746BDM5, from the Insight account of Clodi Holdings, LLC ("Clodi") (over
which Total had trading authority) to DTC participant 987 (*e.g.,* State Street) for
deposit to account BJ60 (*e.g.*, DBTCA's omnibus account at State Street) for further
credit to Clodi Holdings, LLC's purported DBTCA account number AP***3.

45.     Unbeknownst to Insight, Clodi did not have a DBTCA account number
AP***3 or any other account at DBTCA account. Insight dutifully processed this
same-name instruction.

46.     Meanwhile, Haberer, who also had trading authority over the DBTCA
custody account of Rado Limited Partnership ("Rado"), which had a $12.3 million
overdraft in its DBTCA custody account, fraudulently informed DBTCA that the

incoming securities were intended for Rado's DBTCA account to partially offset the overdraft that represented over fifty percent (50%) of DBTCA's annual net revenues.

47.     DBTCA, in turn, informed FIS that DBTCA account BJ60 would be receiving these securities and that FIS was to instruct State Street to deposit the incoming securities into Rado's DBTCA custody account.

48.     On March 15, 2018 Insight received a second forged instruction to transfer the following securities from Clodi's Insight to DTC participant 987's account BJ60 for further credit to Clodi Holdings, LLC's and its purported DBTCA account number AP***3:

| Quantity | Description | CUSIP |
|---|---|---|
| 100,000 | CSN 7% 2088 | G2585XAA7 |
| 100,000 | Alcoa 5.87 2022 | 013817AN1 |
| 3,100 | Citigroup | 172967424 |
| 150,000 | JEF 6.25% 2036 | 472319AC6 |
| 4,350 | SPDR EUR FEZ | 78463X202 |
| 100,000 | Sprint 6.875% 2028 | 852060AD4 |
| 150,000 | TEL ITAL 6.375% 2033 | 87927VAF5 |

49.     Insight dutifully processed this same-name instruction.

50.     On March 15, 2018 Insight also received forged instructions to deliver from the Insight account of Bralisol Associates Ltd. ("Bralisol") (for which Total also had trading authority) the following securities to DTC participant 987's account BJ60

for further credit to Bralisol Associates Ltd.'s purported DBTCA, account number AP***5:

| Quantity | Description | CUSIP |
|---|---|---|
| 127,000 | C 5.9% Perp | 172967GF2 |
| 200,000 | Banco Hipotecario 9.75% 2020 | P1330HBF0 |
| 200,000 | Petrobras 4.375% 2023 | 71647NAF6 |
| 200,000 | YPF 8.5% 2025 | P989MJBE0 |
| 22,145 | UBS | 024476758 |
| 120,000 | Bormbardier 6.125% 2023 | C10602AW7 |

51.　　Unbeknownst to Insight, Bralisol did not have a DBTCA account and account number AP***5 or any other DBTCA account.　In the absence of such knowledge, Insight dutifully processed this same name instruction.

52.　　On March 15, 2018 Insight further received another forged instruction to deliver from the Insight account of ("Aparain") to DTC participant 987's to account BJ60 for further credit to Aparain purported DBTCA account number AP***6, the following securities:

| Quantity | Description | CUSIP |
|---|---|---|
| 185,000 | Petrobras 7.25% Perpetual | 71647NAK5 |
| 150,000 | Chubut 7.75% 2026 | P25619AB6 |
| 44,000 | Petrobras 8.375% 2018 | 71645WAH4 |
| 3,476 | HSBC 8.125% Perpetual | 404280703 |
| 75,000 | Argentina 6.875% 2027 | 040114HL7 |

| 100,000 | Argentina 7.125% 2017 | P04808AN |
|---------|----------------------|----------|

53.  Unbeknownst to Insight, Aparain did not have a DBTCA account and account number AP***6 was not a DBTCA account number.  In the absence of such knowledge, Insight dutifully processed this same-name instruction.

54.  Meanwhile, Haberer had fraudulently informed DBTCA that the incoming securities were intended to be deposited into the Rado DBTCA account to reduce Rado's $12.3 million overdraft due and owing to DBTCA.

55.  DBTCA, in turn, provided the information regarding each of the securities to FIS with instructions that, upon receipt of the securities by State Street, the securities were to be deposited in Rado's DBTCA custody account maintained by State Street.  FIS, in turn, so instructed State Street despite the conflict between DBTCA's direction and the DTC transfer instructions.

56.  Each of the four above transfer instructions identified Insight as the transferring firm and listed the respective Insight account numbers for Clodi, Bralisol, and Aparain.

**STATE STREET'S PARTICIAPTION IN THE CONVERSION OF THE SECURITIES BELONGING TO INSIGHT'S CUSTOMERS**

57.  At the time the above alleged four sets of transfers were initiated, State Street had possession of the names of all DBTCA customers' custody accounts being maintained by State Street as well as the DBTCA custody accounts numbers maintained by each such customer.

58.     At all times relevant hereto, all of DBTCA's custody accounts maintained by State Street used an account number nomenclature of two numeric digits followed by a dash that was, in turn, was followed by six additional digits.

59.     Thus, State Street knew that any account number beginning with the letters "AP", as was included in the four transfer instructions specified above, did not relate to accounts maintained at DBTCA.

60.     Moreover, State Street knew that neither Clodi, Bralisol, nor Borjas maintained a DBTCA custody account.

61.     Further, State Street knew that Rado, the DBTCA customer into whose account into which FIS instructed the received securities were to be deposited was not only not the intended recipient of the four transfers but that Rado was not mentioned anywhere in the transfer instructions.

62.     Since State Street knew both that the account numbers specified in the four DTC transfer instructions did not exist at DBTCA and that the three receiving customers identified on the instructions (Clodi, Bralisol, and Aparain) were not DBTCA customers, these four previously described transfers should have been rejected.

63.     However, in contravention of the explicit transfer instructions and DTC rules, State Street, pursuant to the aforesaid scheme to circumvent anti-money laundering statutes, regulations and rules, knowingly exercised unlawful dominion and control over the securities and proceeded to transfer the securities from DBTCA's omnibus account BJ60 to Rado's account.

16

64. By ignoring the DTC transfer instructions and instead following the unlawful directions of DBTCA, State Street enabled DBTCA to steal the transferred securities in order to significantly reduce the $12.3 million overdraft in Rado's DBTCA custody account.

65. State Street, pursuant to the aforementioned scheme to avoid AML statutes, rules, and regulations, deposited the transferred securities owned by the three Insight customers into Rado's DBTCA custody account despite knowing that:

    a. Concealing from DBTCA the names and account numbers specified by Insight in the DTC transfers instructions would enable a fraudster such as Haberer to obtain unlawful dominion and control over the securities belonging to the rightful owner;

    b. Transferring broker-dealers such as Insight are the custodian of the securities deposited by their customers who are bound to safeguard the securities and to relinquish custody only upon receipt of lawful orders of their customers;

    c. Transferring broker-dealers such as Insight initiate DTC transfers of securities belonging to their customers in reliance on the receiving DTC participants strictly adhering to the obligations imposed by DTC rules and the terms of the transfer instructions;

    d. The securities industry is necessarily dependent on receiving DTC participants strictly adhering to the obligations imposed by DTC rules and the terms of transfer instructions;

    e. By withholding the name and account number of the purported DBTCA customers specified in a transfer instruction while, first, accepting the securities specified therein for DBTCA omnibus account BJ60 and then following DBTCA's instruction to transfer the securities from the BJ60 account to Rado's overdrawn custody account at State Street would permit DBTCA and PWM personnel to exercise unauthorized control of the transferred securities;

f.  Neither Clodi, Bralisol, nor Aparain maintained a DBTCA custody account and that the account numbers specified in the transfer instructions were fictitious.

g.  By depositing the transferred securities to Rado's DBTCA account that was custodied with State Street, it was acting in a manner was (i) contrary to the DTC instructions, (ii) in violation of AML statutes, rules and regulations, (iii) in derogation of Clodi, Bralisol, and Aparain's ownership interest in the securities listed in the transfer instructions; and (iv) in derogation of Insight's obligations as custodian of the transferred assets; and

h.  That regardless if a broker-dealer acted with the due care customary in the securities industry in processing a transfer, a broker-dealer is nonetheless strictly liable for any loss occasioned by the customer whose securities were wrongfully diverted as a result of State Street's aforementioned scheme to avoid AML statutes, rules and regulations. *See* Powers v. American Express Fin. Advisors, Inc., 82 F.Supp.2d 448, 452-54 (D.Md.2000), aff'd, 238 F.3d 414 (processing forged contrary to account agreement); Chaney v. Dreyfus Serv. Corp., 595 F.3d 219 (5th Cir. 2010) (those dealing with agent do so at their own peril that the act being ordered by the agent is legally authorized); *see also* Davis v. Sterne Agee And Leach Inc., 965 So. 2d 1076,1086 (Ala. Sup. Ct. 20077) (This Court . . . holds that a forged directive, i.e., one not executed by the owner of the financial asset, his agent, or his representative, or one that is not ratified by the owner, his agent, or his representative, is not an effective instruction."); and Watson v. Sears, 766 N.E.2d 784, 789 (Ind. Ct. App. 2002) (transferor liable because "Simply put, if the appropriate person does not make the order to transfer assets, then the order is ineffective.").

66.  Moreover, upon receipt of three aforesaid different DTC transfer instructions on March 15, 2018 specifying three different non-existent DBTCA custody accounts sent from the same broker-dealer, State Street knew or should have known that the transfer was part of a fraudulent scheme to deceive the sending broker-dealer (Insight) to believe that the instructions were for same name transfers, especially when State Street was instructed to deposit the securities in a DBTCA custody account not specified in the transfer instructions.

67.     State Street further knew that, as a result of the instructions being purported same-name transfers, the sending institution (Insight) would not have initiated the heightened AML scrutiny for third-party transfers which would require verbal confirmation with the account holder prior to processing the transfer instructions.

68.     Moreover, State Street also knew that, by not returning the securities to Insight as required by DTC rules, Insight would have no reason to contact its customers to inquire what occurred as it would have done if State Street had rejected transfers thereby concealing Haberer's fraudulent actions.

## THE KNOWING CONVERSION OF THE SECURITIES IN INSIGHT'S SAFEKEEPING

69.     At the time State Street deposited the transferred securities in Rado's DBTCA custody account, Rado had an overdraft in the custody account totaling $12.3 million which reflected money that was due and owing to DBTCA.

70.     Despite DBSI and other PWM employees and registrants ultimately learning that the securities transferred pursuant to the March 8 and 15, 2018 transfer instructions were fraudulent, PWM made the decision to retain the proceeds of the fraudulently transferred securities which it had sold, applying the approximately $8.3 million in proceeds to repay itself the amounts it had advanced for the Rado account.

71.     As a direct, proximate, and foreseeable result of State Street's actions which allowed the theft through forgery of the assets in their Insight accounts, Clodi, Bralisol, and Aparain filed FINRA arbitrations against Insight, its owner, Carlos

Legaspy, and Insight's clearing firm, Pershing, LLC. To wit:  <u>Maria De Los Angeles Aparain Borjas and Bralisol Associates, Ltd. v. Carlos Javier Legaspy, et al.</u>, FINRA Arb. No. 18-02781 ("the Bralisol Arbitration") and <u>Clodi Holdings Ltd. vs. Carlos Legaspy, et al</u>, FINRA Arb. No 19-00237 ("the Clodi Arbitration").

72.     In addition to the over $1 million in out-of-pocket damages that Insight incurred related to the Bralisol and Clodi Arbitrations, Insight suffered foreseeable reputational damages since the arbitrations' allegations were published on the internet and falsely accused Insight of fraud and participation in the Ponzi scheme that had been orchestrated by Haberer and his cronies who were using DBTCA and Deutsche Bank NA, New York Branch to fund the Ponzi scheme.

73.      Moreover, as a result of the customers naming Insight's clearing firm in the arbitrations, Pershing LLC ("Pershing") cancelled Insight's clearing agreement which caused further significant damages to Insight.

74.     Pershing's cancellation of Insight's clearing agreement was particularly injurious since Insight's business was concentrated in Latin America and no other clearing firm offered the same panoply of services offered by Pershing or the prestige and confidence of an institution like the Bank of New York (Pershing's owner) in Latin America.

75.     Thus, as a direct, proximate and foreseeable cause of State Street's actions as herein previously alleged, Insight suffered enterprise damages in excess of another $5 million.

## COUNT I

## AIDING AND ABETTING THE CONVERSION OF SECURITIES

76.     Insight realleges paragraphs 1 thru 75, above, as Paragraph 76 of this Count I, as though fully set forth herein.

77.     On March 8 and 15, 2018 State Street intentionally exercised unlawful dominion and control over the securities of Clodi, Bralisol, and Aparain as herein previously alleged.

78.     State Street exercised this unlawful dominion and control over the aforesaid securities with the intent to permanently deprive Clodi, Bralisol, and Aparain of those securities and in contravention of Insight's rights and obligations as the bailee of said securities.

79.     At the time State Street exercised unlawful dominion and control over the securities of Clodi, Bralisol, and Aparain, as herein previously alleged, State Street knew that Insight, as custodian and bailee, had a right to possession of those securities superior to all others except the rightful owners. And, State Street's actions, as herein previously alleged, were intended to deprive and did deprive Insight of its right to possession of those securities.

80.     As herein previously alleged, State Street knew at the time of these unlawful actions that the account holders specified in the aforementioned transfer instructions could hold Insight strictly liable for the loss of their securities.

81. Insight has made a demand on State Street to return the transferred securities or their value on the date of the respective transfers (*see* Exhibit "D" hereto) and State Street has refused to do so.

82. As a direct, proximate, and foreseeable result of State Street's actions as herein alleged, Insight has suffered $7 million in damages.

WHEREFORE, Insight prays that judgment be entered against state Street in favor of Insight as follows:

A Compensatory damage of $7 million;

B. Punitive damages of $21 million;

C. All taxable fees and costs; and

Any further relief the Court deems equitable and just.

## COUNT II

## GROSS NEGLIGENCE

83. Insight alleges paragraphs 1 through 75, above, as this, paragraph 83 of this, Count II, as though fully alleged herein.

84. At all times relevant hereto, as a participant in the DTC transfer system, State Street owed Insight and all broker-dealers who used the DTC system to transfer securities to another financial institution, the duty to strictly adhere to DTC's rules and the letter of the transfer instructions.

85. State Street owed Insight and all broker-dealers using the DTC system to transfer securities to use reasonable care in processing DTC instructions directed to State Street.

86. At the time State Street processed the March 8 and 15, 2018 DTC transfer instructions herein previously alleged, it knew that neither Clodi, Bralisol, nor Aparain maintained a DBTCA custody account and that the account numbers specified in those transfers were non-existent at DBTCA. Nonetheless, State Street accepted the transfers and deposited the securities into Rado's DBTCA custody account.

87. State Street's actions in processing the aforesaid DTC transfers not only departed from the standard of care for the processing of DTC transfers but was grossly negligent.

88. At the time State Street so acted, it was foreseeable that its actions exposed Insight to claims by its customers that Insight had acted without their authorization and was thus liable to then for the value of the securities fraudulently transferred.

89. As a direct, proximate, and foreseeable result of State Street's actions as herein alleged, Insight has suffered $7 million in damages.

WHEREFORE, Insight prays that judgment be entered against state Street in favor of Insight as follows:

A   Compensatory damage of $7 million;

B. Punitive damages of $21 million;

C. All taxable fees and costs; and

D. Any further relief the Court deems equitable and just.

## COUNT III

## TORTIOUS INTERFERENCE

90.     Insight alleges paragraphs 1 through 75, above, as this, paragraph 90 of this, Count II, as though fully alleged herein.

91.     Insight had a reasonable expectation of maintaining its existing relationship with its clients Clodi, Bralisol and Aparain.  Similarly, Insight had a reasonable expectation of maintaining its business relationship with its clearing firm Pershing.

92.     State Street knew or should have known had it not recklessly disregarded the facts, that Insight expected to have a continuing relationship with its clients and with its clearing firm.

93.     At the time State Street processed the March 8 and 15, 2018 transfers alleged above, State Street knew or should have known had it not recklessly disregarded the facts that Insight, as a registered broker-dealer, had a valid and enforceable contractual agreement with Clodi, Bralisol, and Aparain to transfer funds or securities out of their respective accounts only on their express instructions.

94.     State Street engaged in purposeful interference with Insight's relationships that prevented Insight's legitimate expectation of continuing its business relationships.

95.     When State Street accepted the March 8 and 15, 2018 transfer instructions on behalf of DBTCA, State Street knew that processing DBTCA's competing instructions to deposit the securities in Rado's account would necessarily

interfere with Insight's role as the custodian of its customers' assets as well as with Insight's relationship with the clearing firm that forwarded the client's securities to State Street.

96.     As a direct, proximate, and foreseeable result of State Street's actions as herein alleged, Insight has suffered $7 million in damages.

97. WHEREFORE, Insight prays that judgment be entered against state Street in favor of Insight as follows:

A   Compensatory damage of $7 million;

B. Punitive damages of $21 million;

C. All taxable fees and costs; and

D. Any further relief the Court deems equitable and just.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Dated: March 1, 2023                            Respectfully submitted,

/s/ Laurence M. Landsman
One of Plaintiff's Attorneys
.

Nicholas P. Iavarone
The Iavarone Firm, P.C.
561 Arbor Lane
South Elgin Illinois, 60177
(312) 637-9466
(800) 417-0580 (fax)
niavarone@iavaronefirm.com

Laurence M. Landsman
Landsman Saldinger Carroll, PLLC
161 North Clark Street, Suite 1600
Chicago, IL 60601
(312) 291-4651
872-757-1661 (Fax)
landsman@lsclegal.com